MASSACHUSETTS HIGHWAY DEPARTMENT & another[1] *vs.*
PERINI CORPORATION & others[2] (and a consolidated case[3]).

Suffolk. March 10, 2005. - May 26, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Moot Question. Arbitration,* Arbitrable question, Judicial review, Scope of
arbitration. *Contract,* Construction contract, Arbitration.

This court determined to hear, on the merits, aspects of an appeal that
presented live controversies and were not moot. [372]
This court concluded that an arbitration panel, commissioned to resolve
certain disagreements between government agencies overseeing a public
works project and one of its general contractors, had the authority to
decide whether the contractor's claim to additional compensation for
unexpected construction problems had ripened into a pending dispute
before the panel's term expired (and was therefore within the panel's
adjudicative authority, as provided by the terms of the relevant agreements
to arbitrate), where the parties had agreed to arbitrate the claim, where the
question when the claim had ripened was procedural in nature, and where
there was no express agreement to the contrary. [372-380]

CIVIL ACTIONS commenced in the Superior Court Department
on November 19, 2001, and January 15, 2002.

The cases were heard by *Allan van Gestel,* J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Michael B. Donahue (Michael D. Powers* with him) for Mas-
sachusetts Turnpike Authority.

*Garrick F. Cole,* Special Assistant Attorney General, for Mas-
sachusetts Highway Department.

*Joel Lewin (Andrew W. Daniels & Michael D. Healan* with
him) for Perini Corporation & others.

[1]Massachusetts Turnpike Authority.
[2]Kiewit Construction Co., Inc.; and Jay Cashman, Inc., doing business as
Perini-Kiewit-Cashman Joint Venture.
[3]This case involves the same parties and issues, and the parties filed virtu-
ally the same briefs in both cases. Although the Appeals Court denied a mo-
tion to consolidate, the cases were paired for argument before us.

CORDY, J. An arbitration panel, commissioned to resolve certain disagreements between the public agencies overseeing the Central Artery/Tunnel Project (Massachusetts Highway Department and the Massachusetts Turnpike Authority, collectively, the project) and one of its general contractors, determined that it had the authority to hear the contractor's claim to additional compensation for unexpected construction problems. The project disagreed and sought relief, including a stay of the arbitration proceedings in the Superior Court. That relief was denied and the complaints were dismissed. On appeal, the project argues that the judge was incorrect in his ruling that the arbitration panel had the authority to decide whether the contractor's claim for additional compensation had ripened into a pending dispute before the panel's term expired. We affirm the judge's dismissal of the project's complaints. The parties had agreed to arbitrate the claim, and the question when it matured into a pending dispute under the terms of the relevant agreements was procedural in nature. In the absence of an express agreement otherwise, such questions are within the authority of the arbitration panel to decide.

1. *Background.* In 1995, the Massachusetts Highway Department awarded Perini-Kiewit-Cashman Joint Venture (PKC) Public Construction Contract No. C11A1 (contract) for a portion of the project in Boston. The contract included the construction of a tunnel northbound on Interstate Route 93 from Kneeland Street to Congress Street, the reconstruction of the Massachusetts Bay Transportation Authority (MBTA) Red Line South Station, and the construction of a portion of the new MBTA Silver Line. The contract award amount was $377,933,000.

Before it was modified, as described below, division I, subsection 7.16, of the contract established a process for the resolution of disputes between the parties, which was to culminate in nonbinding arbitration before a three-person disputes review board (board). These individuals were to be highly qualified and to have substantial experience in the type of construction involved in the contract, in the interpretation of similar contracts, and in the resolution of construction claims. PKC and the project were each to appoint one member of the board, and these two members were to select another member, a

chairperson. The board members were to serve one-year terms, which automatically renewed unless either party elected otherwise. Members of the board not renewed were required to "complete consideration of any Disputes that were *pending before the [board] at the time the non-renewal election was made*" (emphasis added). The first board to convene under the agreement was replaced by a second board, which began its term on December 1, 1999.

Under this dispute resolution process, PKC would submit "claims" to the project director seeking "relief in any form arising out of or relating to" the contract. In the event that PKC disagreed with the director's "Final Determination" regarding a claim,[4] the claim became a "dispute," which could be heard by the board. After hearing and consideration of the parties' filings, the board would then submit its findings and recommendations to the director of the project, who would make a final decision on the dispute. The contract provided that the project director's final decisions could be appealed to the board of commissioners of the Massachusetts Highway Department or to Superior Court.

As the work progressed, hundreds of specific issues related to the contract arose between the parties, and they ultimately agreed to modify the dispute resolution process to expedite consideration of those issues. In March, 1999, the parties executed a binding "Dispute Resolution Agreement" (agreement) to "supersede and/or supplement, where appropriate, the dispute resolution process" set out in the contract. The agreement empowered the board to adjudicate "any and all disputes" concerning claims that the parties listed in an exhibit (exhibit 1) attached to the agreement. It also provided that any decision of the board would be binding on the parties.[5] A separate exhibit established "amended meeting rules" that set the board's

---

[4] The contract does not set forth the process by which the project is to reach a "Final Determination" on a contractor claim, although the record includes the affidavit of the resident engineer for the project, who describes an extensive internal review process for a contractor claim before a "Final Determination" is issued.

[5] Specifically, paragraph 8 of the agreement provides, "[t]he [board] and/or any supplemental [board] acting under the provisions of this Agreement, shall have the authority to act upon the majority vote of the members of the [board] and, any Order and/or Award issued by the [board] pursuant to a majority vote

schedule of meetings in relation to the receipt of the project's "Final Determination" on a claim.[6]

One of the claims listed in exhibit 1 involved so-called "underpinning impacts." In this claim, PKC sought to recover the difference between the estimated cost of the underpinning work prior to the contract award and the actual cost of the work that had been affected by unforeseen conditions encountered during construction.[7] Included within the scope of the underpinning impacts claim were thirty-three individual claims totaling $20,000,000[8] (collectively referred to herein as underpinning claim). On August 31, 2000, PKG formally submitted the underpinning claim to the project for its "review and final determination as to merit." On October 11, PKG sent a letter to the project regarding the underpinning claim, with copies to the board, asserting its belief "that the Project does not intend to issue a Final Determination on this major claim within a reasonable period of time." The letter further stated that "[t]he Project and PKC do not and cannot agree on the issue of whether a 'Final Determination' is a jurisdictional prerequisite for resolution of claims by the [board] under" the agreement, and

of its members, shall be valid, final and binding upon the Parties and shall be enforceable by the Superior Court."

[6]The amended meeting rules (rules) seem to assume that the receipt of a Final Determination from the project director is to precede the board's review of a claim. For example, section 3.0(A) of the rules provides, "[w]ithin ten (10) calendar days after the receipt of a Final Determination on a claim, either Party may file a written request for a meeting with and a review of the claim by the [board]. A request for a meeting with the [board] is a condition precedent for proceeding on a claim and the absence of such request shall be deemed to be a waiver of that claim."

[7]The underpinning work involved the construction of a support structure for the Red Line, so that the subway service could continue to operate above ongoing excavation. The underpinning impact claim requested additional compensation for PKC's work to address excessive water infiltration, unforeseen physical obstruction, and other unexpected physical conditions encountered during the construction process.

[8]PKC also submitted several change proposals related to this claim to the project between 1997 and 1999, some of which the project paid and some of which the project denied. The disagreements between the parties about the underpinning impact claim also surfaced in a dispute heard by the second board during the summer of 2000 regarding over-all delay costs between 1996 and 1999, as the majority of the claimed delay was related to underpinning impacts.

contended that "this dispute on 'Final Determinations' . . . is subject to adjudication by the [board]." The letter concluded by requesting a meeting with the board to ascertain whether "a dispute exists between the parties relative to issuance of a Final Determination on [the underpinning claim] and that this claim is, in fact, a 'Dispute' between the parties subject to binding adjudication by the [board]." PKC also requested that the entire underpinning claim dispute be scheduled for the board's January, 2001, hearing.

On October 12, 2000, the project elected not to renew the terms of the members of the board.[9] On October 13, the project responded to PKC's letter regarding the underpinning claim, stating that it had not yet completed its review of the claim because it needed additional information from PKC to do so. It also objected to PKC's contention that PKC could bring the claim to the board before the project had issued a Final Determination.

Thereafter, and during the project's review of the underpinning claim, the parties engaged in an active dispute before the board regarding the necessary procedural prerequisites for it to hear PKC's claims under the agreement. On December 20, after a November hearing, the board issued Order 8, in which it concluded that "as a procedural requirement, Contractor claims must receive, in the absence of a contractual definition for 'Final Determination', an 'effective denial' by [the project] prior to [board] adjudication under the Binding Agreement." It further concluded that such an "[e]ffective denial" could take the form of a "Final Determination" or a " 'deemed' or 'de facto' denial resulting from the actions, inactions or apparent intentions of the Parties." With specific reference to the underpinning claim, the order stated: "To date there has been no [project] denial of this claim. Although not a jurisdictional issue, the procedural step of an effective denial has not taken

---

[9]Under the contract, either the project or PKC could elect not to renew the board members for another one year term. The contract also provides that such an election must be made in writing "no later than forty-five (45) Days prior to the expiration of the [board] members' term." Here, the board members' terms were to conclude on November 30, 2000, and the project sent written notice of its nonrenewal election to PKC and the board on October 12, 2000, in compliance with the forty-five day notice provision.

place. If [the project] does deny the claim and the Contractor requests a meeting with the [board] in accordance with the Binding Agreement, then the [board] will be prepared to hear the dispute."

After one year of correspondence between the parties regarding the project's repeated requests for further information, the project issued a "Final Determination" on the underpinning impact claim on October 19, 2001. It rejected PKC's methodology for calculating the claim's value, faulted PKC for providing insufficient information, and found that PKC was entitled to a "Total Compensable Amount" of $2,369,608 for the claim (a figure sharply below the $20,017,636 PKC had claimed). In a letter dated October 31, PKC formally requested a hearing before the board to resolve the disputed underpinning claim and related disputes, arguing that the board had the authority to hear the dispute because it existed before the nonrenewal of the board members. On November 16, the project filed suit in the Superior Court to stay the board's proceedings pursuant to G. L. c. 251, § 2.

Notwithstanding the lawsuit, proceedings before the board continued, the project objecting to the board's jurisdiction on the ground that the project's Final Determination did not issue before it was nonrenewed. On December 14, 2001, the board issued Order 10, announcing that it would proceed to an adjudication of the underpinning claim dispute. The order contained a schedule for the parties' submittals and for hearings on the dispute. It also contained a ruling that the board had the authority to adjudicate the matter under the agreement and Order 8, given PKC's efforts to raise the underpinning claim before the nonrenewal of its members' terms. Following receipt of Order 10, the project filed another suit in the Superior Court, requesting that the court vacate Order 10, stay arbitration proceedings, and issue a judgment declaring that the underpinning impact claim was not arbitrable.

On March 22, 2002, a judge denied the project's motions for stays in both lawsuits. The project filed a motion for reconsideration that the judge also denied. The judge allowed the project's alternative request for the entry of final judgment, and judgments dismissing the complaints entered on May 3, 2002.

The project filed timely notices of appeal, and we transferred the cases from the Appeals Court on our own motion.

Pending the appeal, the proceedings before the board continued. The parties offered position papers, presentations, and documentation, and participated in a hearing. On June 12, 2002, the board ordered the project to pay PKC $5,596,000 to resolve the underpinning claim.

2. *Mootness.* As a threshold matter, PKC argues that the project's appeals are moot because the arbitration of the underpinning dispute has concluded. With respect to the project's appeals from the judge's denials of its motions to stay arbitration under G. L. c. 251, § 2, PKC is correct. The court cannot, as a practical matter, stay proceedings that have run their course. See, e.g., *Rasten* v. *Northeastern Univ.*, 432 Mass. 1003 (2000), cert. denied, 531 U.S. 1168 (2001) (appeal moot because hearing that plaintiff sought to have continued took place as scheduled).

However, the remaining aspects of the project's appeals present live controversies and are not moot. The essence of the continuing dispute in this case is the legitimacy of the concluded proceeding itself. The project's request for a declaratory judgment and for the vacation of Order 10 directly challenges the authority of the board to hear and decide the underpinning claim. If the project prevails on that issue, there would be a basis for vacating the award. These circumstances thus involve the prospect of the project's obtaining practical relief from the court, providing the project and PKC with a continuing stake in the outcome of the appeal. See *Acting Supt. of Bournewood Hosp.* v. *Baker*, 431 Mass. 101, 103 (2000). We turn to the merits of the project's appeals.

3. *The board's authority to hear and decide the underpinning impact dispute.* The parties' agreement provides for binding arbitration for "any and all disputes concerning the claims listed on Exhibit 1." There is no dispute that the parties agreed to have the board or a successor board, acting as arbitrators, resolve all of PKC's claims listed on exhibit 1 to the agreement, including the underpinning claim.

While acknowledging that the agreement provides for the eventual arbitration of the underpinning claim, the project argues

that we should decide, based on our review of the agreements and the record, whether the underpinning claim had met the procedural prerequisites for arbitration before this particular board, i.e., whether that claim had matured into a "dispute" which was "pending" before the board as of the date of the nonrenewal of its members. The argument rests on the notion that these procedural prerequisites are essentially substantive limitations on the disputes the parties agreed to arbitrate and thus are subject to interpretation by the courts, not by the board.

The agreement itself provides no unambiguous way to resolve this question, specifying simply that the board has the authority to adjudicate "any and all disputes concerning the claims listed on Exhibit 1."[10] Cf. *School Comm. of Hanover* v. *Hanover Teachers Ass'n*, 435 Mass. 736, 741 (2002) ("Because the limiting language speaks with clarity, and leaves no room for doubt as to interpretation, no presumption of arbitrability arose"). While such language could encompass the board's authority to decide the disputed issue whether the underpinning claim was pending before it at the time of the nonrenewal of its members, because in a broad sense, it is a "dispute[] concerning" PKC's underpinning claim, the agreement is not clearly amenable to such an interpretation. As the project suggests, a synthetic reading of the contract's and the agreement's dispute resolution provisions could readily support the conclusion that the underpinning claim was not a "dispute" in the sense intended by the agreement until the project issued a Final Determination on the claim, which was after the nonrenewals, and was therefore outside the board's adjudicative authority. Without a clear answer to be gleaned from the agreement itself, we must determine, with reference to existing case law, whether the

---

[10]Massachusetts courts have implied, especially in the context of labor arbitration, that an agreement that does not expressly empower the arbitrator to decide issues of the agreement's interpretation leaves those issues to the courts. See *Local No. 1710, Int'l Ass'n of Fire Fighters* v. *Chicopee*, 430 Mass. 417, 428-429 (1999) (*Chicopee*); *Massachusetts Mun. Wholesale Elec. Co.* v. *Local 455, Int'l Bhd. of Elec. Workers*, 28 Mass. App. Ct. 921, 922 (1989); *Old Rochester Regional Teacher's Club* v. *Old Rochester Regional Sch. Dist. Comm.*, 398 Mass. 695, 700 (1986); *School Comm. of Southbridge* v. *Brown*, 375 Mass. 502, 504 & n.2 (1978). As discussed note 11, *infra*, we conclude that this interpretive assumption does not survive *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002).

court or the board should decide if the underpinning claim met the procedural prerequisites to be pending before the board as of the date of nonrenewal.

In *Local No. 1710, Int'l Ass'n of Fire Fighters* v. *Chicopee*, 430 Mass. 417 (1999) (*Chicopee*), this court enumerated the "guiding principles" applicable to cases involving contested arbitration proceedings, as set out in the decisions of the United States Supreme Court interpreting Federal labor law. *Id.* at 420. The first principle is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 420-421, quoting *AT&T Techs., Inc.* v. *Communications Workers*, 475 U.S. 643, 648 (1986) (*AT&T*). "The second principle is that the question whether an agreement creates a duty to arbitrate is 'undeniably an issue for judicial determination . . . [u]nless the parties clearly and unmistakably provide otherwise.' " *Chicopee, supra* at 421, quoting *AT&T, supra* at 649. "The third principle is that, 'in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims . . . [including] determining whether there is particular language in the written instrument which will support the claim.' " *Chicopee, supra*, quoting *AT&T, supra* at 649-650. The final principle is that, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " *Chicopee, supra*, quoting *AT&T, supra* at 650.

These principles seek a balance between the statutory policy favoring arbitration as an expeditious and efficient means for resolving disputes and the courts' role as the guardian of the parties' right to submit to arbitration only those disputes that the parties intended. See *Home Gas Corp. of Mass.* v. *Walter's of Hadley, Inc.*, 403 Mass. 772, 774 (1989). Questions of "arbitrability" are for the courts, while the merits of arbitrable disputes are always for the arbitrators. See *Old Rochester Regional Teacher's Club* v. *Old Rochester Regional Sch. Dist. Comm.*, 398 Mass. 695, 700-701 (1986) (judicial review of arbitrator's

decision in labor case limited to whether arbitrator exceeded powers); *Stop & Shop Cos.* v. *Gilbane Bldg. Co.*, 364 Mass. 325, 329-330 (1973), quoting *Cavanaugh* v. *McDonnell & Co.*, 357 Mass. 452, 457 (1970) ("arbitration, once undertaken, should continue freely without being subjected to a judicial restraint which would tend to render the proceedings neither one thing nor the other, but transform them into a hybrid, part judicial and part arbitrational"). See also *Danvers* v. *Wexler Constr. Co.*, 12 Mass. App. Ct. 160, 166-167 (1981) (denying "recourse to arbitration . . . would . . . disregard the method specifically chosen by the parties to settle all their disputes and which would judicially rewrite their contract for them").

Since we decided the *Chicopee* case, the United States Supreme Court has elaborated further on the respective roles of arbitrators and the courts in interpreting arbitration agreements. In *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), a client of an investment firm sought to submit a dispute to an arbitrator under the investment firm's standard client service agreement. The forum for the arbitration was the National Association of Securities Dealers, which had a procedural rule requiring matters to be submitted no later than six years after the events giving rise to the dispute. *Id.* at 82. Because the controversy between the client and firm arose more than six years prior to the submission of the matter to the arbitrator, the firm filed suit in Federal court, requesting a declaration that the dispute was ineligible for arbitration and an injunction against any arbitration proceedings. *Id.* In holding that the question of the dispute's eligibility for arbitration is a matter presumptively for the arbitrator, the Court reasoned:

> "Linguistically speaking, one might call any potentially dispositive gateway question a 'question of arbitrability,' for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase 'question of arbitrability' has a far more limited scope. . . . [A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide. . . . At the same time the Court has

found the phrase 'question of arbitrability' *not* applicable in other kinds of general circumstances where parties would likely expect that an arbitrator would decide the gateway matter. Thus ' "procedural" questions which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide" (emphasis in original).

*Id.* at 83-84, quoting *John Wiley & Sons* v. *Livingston*, 376 U.S. 543, 557 (1964) (*John Wiley*). The Court proceeded to quote approvingly from the Revised Uniform Arbitration Act of 2000, which "states that an 'arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." *Id.* at 85, quoting Revised Uniform Arbitration Act of 2000 § 6 (c), 7 U.L.A. 12-13 (Master ed. Supp. 2002).[11]

With this recently clarified delineation of the roles of arbitrators and courts, we return to the central question of this case: Did the board have the authority to determine whether the underpinning claim dispute was already "pending" as of the date of the project's election not to renew its members? We

---

[11]In *Chicopee, supra* at 429, we concluded that, in the context of an expressly limited arbitration clause in a labor agreement between a union and a city, a judge should decide whether the agreement allowed the arbitrator to interpret the agreement's timeliness requirements for grievances. The basis for this conclusion was the limiting language in the arbitration clause, which distinguished the case from those Supreme Court decisions assigning "procedural" issues to arbitrators where the agreements at issue contained "broad" or "standard" arbitration clauses. *Id.* at 422-429. The language of the arbitration clause in the *Chicopee* case provided for binding arbitration of unresolved grievances "as to the meaning, application or interpretation of this Agreement relating to wages, hours, standards of productivity or performance or other terms and conditions of employment." *Id.* at 419. When an arbitration clause is so limited, courts of course retain the ability to decide whether the parties contracted to arbitrate a given dispute. See *Howsam* v. *Dean Witter Reynolds, Inc., supra* at 83; *Chicopee, supra* at 421. However, under *Howsam* v. *Dean Witter Reynolds, Inc., supra*, limiting language would not trigger any special judicial obligation to decide gateway procedural disputes, such as whether the arbitrator may adjudicate a grievance not timely filed, even when the agreement does not clearly specify that such matters are to be arbitrated. *Id.* at 85 ("In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended" arbitrators to interpret and apply procedural rules of arbitration). Insofar as *Chicopee* or the cases it cites imply otherwise, we no longer adhere to that view. Only those contracts with arbitration clauses that expressly preclude arbitrators from deciding gateway procedural disputes will support judicial intervention.

conclude that the question is procedural in nature and not a substantive limitation on the board's authority. First, the question's answer has no bearing on the dispute's ultimate arbitrability or disposition whatsoever and solely determines *which* board will adjudicate the merits of the dispute. See *Green Tree Fin. Corp.* v. *Bazzle*, 539 U.S. 444, 452 (2003) ("the question is not whether the parties wanted a judge or an arbitrator to decide *whether they agreed to arbitrate a matter. . . .* Rather the relevant question here is what *kind of arbitration proceeding* the parties agreed to"). Second, the question involves the sequence of prerequisites for the dispute's submission to the board, and thus presents, at least with respect to this particular board, an issue of procedural arbitrability similar to "time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate" (emphasis omitted). *Howsam* v. *Dean Witter Reynolds, Inc., supra* at 85, quoting Revised Uniform Arbitration Act of 2000 § 6 comment 2, *supra* at 13.

Although it may not have been clear in the agreement itself, the procedural question in this case should be for the arbitrator. See *Green Tree Fin. Corp.* v. *Bazzle, supra* at 452, quoting *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985) ("if there is doubt . . . about the 'scope of arbitrable issues' — we should resolve that doubt 'in favor of arbitration' "). See also *Stop & Shop Cos.* v. *Gilbane Bldg. Co.,* 364 Mass. 325, 330 (1973) ("Matters having to do with the procedure to be followed before the arbitrators are peculiarly for resolution by them"). In the seminal arbitration case, *John Wiley, supra,* cited extensively in *Howsam* v. *Dean Witter Reynolds, Inc., supra,* an employer argued that it had no duty to arbitrate a grievance because the union had failed to follow the first two steps of the three-step grievance procedure and comply with a time limitation on grievances. *John Wiley, supra* at 556. The union argued that the employer's refusal to recognize the union after the employer acquired the represented employees in a merger made it futile to follow the grievance steps in the contract. *Id.* at 557. Because "[q]uestions concerning the procedural prerequisites to arbitration do not arise in a vacuum," the Court reasoned that the employer was not entitled to have a judge determine the union's compliance with the procedures of

the arbitration agreement. *Id.* at 556-557. "Doubt whether . . . procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration." *Id.* at 557. The Court held that "[o]nce it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute," such as the matter of the union's compliance with arbitration procedures, "should be left to the arbitrator." *Id.* The Court further noted that "the opportunities for deliberate delay and the possibility of well-intentioned but no less serious delay created by separation of the 'procedural' and 'substantive' elements of a dispute are clear." *Id.* at 558. See *Green Tree Fin. Corp.* v. *Bazzle, supra* at 452-454 (remanding for arbitration question whether parties' contracts forbid class arbitration; "the relevant question . . . concerns contract interpretation and arbitration procedures. Arbitrators are well situated to answer that question").

We find the reasoning of the *John Wiley* case, as reaffirmed by *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), persuasive and applicable to the present dispute. Like the collective bargaining agreement at issue in *John Wiley*, the agreement here provides for a set of procedural prerequisites for a claim to reach arbitration. With the same arguments as the *John Wiley* employer, the project argues that the underlying dispute is only arbitrable before this board after those procedural prerequisites have been satisfied. In accord with *John Wiley*, we disagree.

There is evidence in the record that the underpinning claim dispute was one of a package of related disputes submitted to the board between 2000 and 2002, and that locating, selecting, and orienting qualified individuals for a third board proved time consuming and difficult. As in the *John Wiley* case, there was here a "context of an actual dispute about the rights of the parties to the contract" that informed the board's decision to proceed with the underpinning dispute. *John Wiley, supra* at 556-557. The dispute over the board's authority to do so

presents a single aspect of a larger controversy. See *Howsam* v. *Dean Witter Reynolds, Inc., supra* at 85; *John Wiley, supra* at 559. Judicial intervention in the procedural disputes surrounding arbitration seems to us particularly inappropriate in this case, where there is no dispute that the parties have agreed to arbitrate the substantive matter at issue, PKC's underpinning claim. See *Green Tree Fin. Corp.* v. *Bazzle, supra* at 452-453. In these circumstances, it does no violence to the intentions of the parties to conclude that procedural questions such as the one involved here, in the absence of an express agreement otherwise, should be resolved by the arbitrator. See *Howsam* v. *Dean Witter Reynolds, Inc., supra* at 85.

The presumption that such procedural questions are the province of the arbitrator do not allow the arbitrator, as the project argues, to determine its own jurisdiction or length of tenure. Cf. *Chicopee, supra* at 421, quoting *AT&T, supra* at 651 ("The willingness of parties to enter into agreements [to arbitrate] would be 'drastically reduced,' however, if [an] . . . arbitrator had the 'power to determine his own jurisdiction' "). Where an arbitrator has exceeded its authority and taken up a dispute not properly before it under the arbitration agreement, courts have a duty to enforce the terms of the agreement. See G. L. c. 251, § 12 (*a*) (3) ("court shall vacate an award if: . . . the arbitrators exceeded their powers"); *Trustees of the Boston & Me. Corp.* v. *Massachusetts Bay Transp. Auth.*, 363 Mass. 386, 390 (1973) (whether arbitrator exceeded authority is "a question which is always open for judicial review"). See also *AT&T, supra* at 651, quoting Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1509 (1959) (under contrary rule "an arbitrator would not be constrained to resolve only those disputes that the parties have agreed in advance to settle by arbitration, but, instead, would be empowered 'to impose obligations outside the contract limited only by his understanding and conscience' "). In these cases, the agreement and contract explicitly charge the board with resolving those disputes pending before it at the time of its nonrenewal, but leave ambiguous whether that charge includes the adjudication of the arbitable disputes listed on exhibit 1, for which the project had not issued a final determination, but about which PKC had

requested a hearing prior to the nonrenewal of the board's members. Given such procedural ambiguity and the interpretive rule of *Howsam* v. *Dean Witter Reynolds, Inc.*, *supra*, it cannot be said that the arbitrator's decision to proceed to hear the underpinning impact dispute exceeded its authority.

Fortunately, the arbitration proceeding on the underpinning claim was not stayed and has now concluded. This case "well illustrates" that the delays occasioned by litigating procedural issues attendant to arbitration "may entirely eliminate the prospect of a speedy arbitrated settlement of the dispute, to the disadvantage of the parties" and are contrary to the goals of the agreement and the policy underlying G. L. c. 251. *John Wiley*, *supra* at 558.

4. *Conclusion.* The project's appeals from the judge's denials of its motions to stay arbitration are now moot. The judgments dismissing the project's complaints are affirmed.

*So ordered.*