Botsford, Margot, J.
The plaintiffs, Wind River Environmental, LLC, and Wind River Leasing, LLC (collectively, Wind River), bring this action for declaratory relief, breach of contract, fraud and misrepresentation against the defendant Private Equity Partners I, L.P. (PEP). The claims relate to a stock purchase agreement that Wind River entered into in March of 2002 with Presidio Partners, LLC, and pursuant to which Wind River agreed to purchase Presidio’s interests in three entities, none of which is a party to this case. At that time, PEP was a member of Presidio, and in accordance with the terms of the agreement between Wind River and Presidio, became the holder of a note issued by Wind River. Part of the relief sought by Wind River in this case is a declaration that this note is null and void.
PEP is a limited partnership that is organized under the laws of Delaware and with a principal place of business in Fort Worth, Texas. It has filed a motion to stay proceedings in this case and to compel arbitration. After hearing, I conclude that the motion should be allowed.
Background
Based on the allegations of the complaint and the documents attached to the complaint as well as to the motion to compel arbitration, the following background facts appear to be undisputed. Wind River and Presidio entered into an agreement on March 13, 2002, that is called within the text of the agreement a “Stock Purchase Agreement,” but is entitled “Redemption and Purchase Agreement” (referred to hereafter as the Agreement). Wind River, the buyer, and Presi-dio, the seller, are described in the Agreement as Delaware limited liabilily companies. Among other terms, the Agreement provides that Presidio will transfer all its membership interests in three subsidiaries— Clear Creek Environmental, LLC, Clear Creek Leasing, LLC, and Gorilla Truck Sales, LLC — to Wind River. The purchase price is stated to be $4,261,411, to be paid by promissory notes issued to the various entities with membership interests in Presidio, including PEP. The note issued to PEP was in the amount of $408,829.
The Agreement contains indemnification provisions that include a right of Wind River to indemnification with respect to “any damages in connection with any breach of any representation, warranty, covenant, or obligation made by [Presidio] in this Agreement or any other Document.” (Agreement, §6.1.) The members of Presidio are also obligated to indemnify, but only up to the principal amount of the note from Wind River received by that member, and only in the form of set off. (Agreement, §6.6.) Of particular relevance to this action, the Agreement contains the following provisions relating to procedures for indemnification:
7.0. In order to administer efficiently the implementation of the Agreement by the members who hold Notes issued by [Wind River] and the settlement of any dispute with respect to the Agreement, the members of [Presidio] who receive distribution of Notes (the “Noteholders”) have or will designate Will Thorndike and Richard Reese their representatives (the “Noteholders’ Representatives”). The members of [Presidio] have or will authorize the Noteholders’ Representatives (i) to take all action necessary in connection with the implementation of the Agreement on behalf of the members or the settlement of any dispute, (ii) to give and receive all notices required to be given under this Agreement and (iii) to take any and all additional action as is contemplated to be taken by or on behalf of the Noteholders by the terms of this Agreement. AU. decisions and actions by the Noteholders’ Representatives shall be binding upon all of the Noteholders.
*565 7.4. Prior to making any claim for set-off against amounts due to the Noteholders under the Notes, [Wind River] will submit its claim for indemnification to arbitration under the provisions of this Agreement, and shall only set off against the Notes if and to the extent the arbitrator has rendered a judgment in favor of [Wind River].
(Agreement, §§7.0, 7.4; emphasis supplied.) Finally, the Agreement contains an arbitration clause that reads as follows:
8.1. Any dispute arising out of or relating to this Agreement or a Note or the negotiation, breach, termination, performance or validity thereof shall be administered in accordance with the Arbitration Procedures agreed to as of this date. Notwithstanding anything to the contrary in this paragraph, either party may seek a court order to enforce any judgment by an arbitrator.
(Agreement, §8.1; emphasis supplied.)
After executing the Agreement, Wind River claims that it discovered a violation of the representations in the Agreement concerning the acquisition of Clear Creek Environmental and the other two affiliated entities, and that it notified the two named noteholders’ representatives, Will Thorndike and Richard Reese, of the claim. (Complaint, ¶32.) The two noteholders’ representatives then resigned. (Complaint, ¶33.) Thorndike resigned effective June 7, 2002, and Reese effective October 14, 2002. (PEP Reply in Support of Motion to Compel Arbitration and Stay Proceedings, ex. B, C.) As of July 3, 2003, Douglas Tudor and Nick Mansour agreed to serve as substitute noteholders’ representatives. As of that date, 36 of 43 noteholders had agreed to have Tudor and Mansour represent them, but 7 noteholders had not, including PEP. (PEP Reply, ex. E.) Thereafter, Tudor and Mansour entered into settlement discussions with Wind River relating to its claims. Ultimately a settlement was reached, in lieu of a complete arbitration of Wind River’s claims. The settlement included a release of all claims by both Wind River and the settling noteholders, a cancellation of the original notes, and a substitution of new notes that gave Wind River a longer time to pay them off. (PEP Reply, ex. G.) According to the complaint, all the original noteholders accepted this settlement and the substitute notes except for PEP, which has refused and which continues to insist on payment of the original note. Wind River takes the position that PEP did agree to accept Tudor and Mansour as substitute Representative Noteholders, or in any event is bound by the settlement that Mansour and Tudor reached with Wind River.
Discussion
PEP asserts that Wind River’s claims “aris[e] out of or relátele] to” the Agreement and the note that PEP holds, and therefore, they are subject to arbitration under §8.1 of the Agreement, a provision that is incorporated into the note. Wind River rejects that position, arguing that in the first instance, it is seeking to enforce the settlement agreement reached by the substitute noteholders’ representatives, and is not obligated to re-arbitrate its claim. Wind River points to two provisions in the Agreement to support its position: §7.0, quoted above, which states that the noteholders’ representatives are authorized to settle any dispute on behalf of the members, and “[a]ll decisions and actions by the Noteholder Representatives shall be binding upon all of the Noteholders”; and the last sentence of §8.1, the arbitration section, which provides that “ [notwithstanding anything to the contrary in this [section], either party may seek a court order to enforce any judgment by an arbitrator.”
If the two noteholders’ representatives named in the Agreement, Will Thorndike and Richard Reese, had continued to serve in that position and had entered the settlement agreement with Wind River, there is little doubt that Wind River would be entitled to enforce that settlement against each noteholder, including PEP, without any further arbitration. The difficulty for Wind River is that Thorndike and Reese did not so continue. The Agreement specifically designates these two men as the “Noteholders’ Representatives,” but it is completely silent on what happens if one or both of them were to resign or otherwise be unavailable to serve.
Wind River seems to assume that as a matter of law, Mansour and Tudor, the two men who assumed the role of substitute or successor noteholders’ representatives, have the same authority to bind all the noteholders to any settlement reached as the two originally named noteholders’ representatives named in the Agreement. Whether or not this is so depends on how the Agreement is interpreted. More particularly, the question is how the Agreement should be construed or interpreted to deal with the issue of a vacancy or vacancies in the position of noteholders’ representatives: does the Agreement mean that if Thorndike and Reese are no longer serving, the silence of the Agreement on the question of succession means there can be no substitutes or successors appointed, and the provisions of §7.0 become inoperative; or should the Agreement be construed to authorize a reasonable system of substitution, in order to continue to give effect to all provisions of the Agreement, including §7.0? This is a threshold question that seems critical to the proper resolution of at least Wind River’s claim for declaratory relief and one part of its breach of contract claim. The point in posing the question is not then to answer it, but to demonstrate that at the core of this case is an issue of how properly to interpret the Agreement’s provisions. Under the clear terms of the Agreement’s arbitration clause, §8.1, that is a matter for the arbitrator, because the interpretive question is a “dispute arising out of or relating to” the Agreement. See, e.g., Massachusetts Highway Dept. v. Perini Corp., 444 Mass. 366, 373 n.10 (2005).
*566 ORDER
For the foregoing reasons, the motion of the defendant Private Equity Partners I, L.P., to compel arbitration of the claims in the complaint and to stay further proceedings in this action pending arbitration is allowed. A status conference will be held on January 22, 2008, to determine whether there will be any further proceedings in this action.